IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHARMAINE JONES, | ) | |
| | ) | Case No. 1:19-cv-1076 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION** |
| Defendant. | ) | **AND ORDER** |

Plaintiff, Charmaine Jones, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act. This matter is before me pursuant to 42 U.S.C. § 405(g) and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. ECF Doc. 12. Because the Administrative Law Judge ("ALJ") failed to apply proper legal standards in evaluating treating physician Dr. John Jewell's April 2017 opinion, the Commissioner's final decision denying Jones's application for DIB must be VACATED and the case REMANDED for further proceedings consistent with this memorandum of opinion and order.

## I.     Procedural History

On January 2, 2017, Jones applied for DIB.  (Tr. 141-42).[1]  Jones alleged that she became disabled on May 31, 2016, due to osteoarthritis, depression, arthritis, sleep apnea, polyuria, overactive bladder, and carpal tunnel syndrome.[2]  (Tr. 161-62).  The Social Security Administration denied Jones's application initially and upon reconsideration.  (Tr. 62-91).  Jones requested an administrative hearing.  (Tr. 107-08).  ALJ Keith Kearney heard Jones's case on June 14, 2018, and denied the claim in a September 25, 2018, decision.  (Tr. 12-61).  On March 29, 2019, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6).  On May 14, 2019, Jones filed a complaint to obtain judicial review of the Commissioner's decision.  ECF Doc. 1.

## II.     Evidence

### A.     Medical Evidence

On October 15, 2015, Jones told Maureen Kolasky, CNP, that she had abdominal discomfort, pain, bloating, spasms, alternating constipation and diarrhea, and weight gain.  (Tr. 239).  On examination, Kolasky noted that Jones had a normal abdomen, no pain in her back, and normal motor and sensory function in her back.  (Tr. 240).  Kolasky diagnosed Jones with constipation/diarrhea, rectal leakage, and frequent urination.  (Tr. 240).  Kolasky recommended a soft, bland diet, but Jones said that "with [a past laparoscopic sleeve gastrectomy] I can eat whatever I want."  (Tr. 240).

On October 21, 2015, Jones told Amanda Corniello, CNP, that she had severe (10 out of 10) back pain that got worse over the prior four days.  (Tr. 237).  Jones said that her pain did not radiate, but it was aggravated by bending, twisting, and certain positions.  (Tr. 237).  She denied

---

[1] The administrative transcript is in ECF Doc. 10.
[2] Jones later submitted a form amending the alleged onset date to August 30, 2016; however, the ALJ considered the entire period from the originally alleged onset date.  (Tr. 15, 159).

any numbness, headaches, abdominal pain, pelvic pain, leg pain, tingling, weakness, or paresthesias. (Tr. 237). On examination, Corniello noted that Jones had normal range of motion in her neck; normal cardiovascular and pulmonary functions; and normal sensation, strength, and reflexes. (Tr. 238). But Jones's stance and gait were abnormal. (Tr. 238). Corniello diagnosed Jones with back pain without sciatica and recommended moist heat, a Medrol dose pack, muscle relaxant, and other medications. (Tr. 238-39).

On October 29, 2015, John Jewell, MD, treated Jones for pain in her lower back, knees, ankles, elbows, and both sides. (Tr. 231). Jones said that she had hurt herself while cleaning on October 18, 2015, but she denied joint swelling and radiating pain. (Tr. 231). She also reported sharp stomach pain with bowel movements and constipation/diarrhea. (Tr. 231). A CT-scan showed that Jones had a small hiatal hernia, mild heart enlargement, osteopenia, multilevel degenerative changes in her spine, and degenerative joint disease in her bilateral hips. (Tr. 231-32). Dr. Jewell diagnosed Jones with joint pain and alternating constipation/diarrhea, and he prescribed medications and vitamins. (Tr. 233).

On February 5, 2016, Jones saw William Damm, MD, for a physical. (Tr. 226, 309). Dr. Damm noted that Jones had a history of migraines, obstructive sleep apnea, major depressive disorder, and general osteoarthritis. (Tr. 226, 309). Jones denied back pain, chest pain, abdominal pain, neck pain, dizziness, and headaches. (Tr. 227, 310). On examination, Jones was oriented and well developed; had normal cardiovascular and pulmonary functions; and did not have any noted musculoskeletal problems. (Tr. 227-28, 310). Dr. Damm prescribed medication for Jones's major depression, seasonal affective disorder, and overactive bladder. (Tr. 228, 311).

On March 18, 2016, Jones told Lyndsay Pankratz, CNP, that she had chest and sinus congestion, a cough, and shortness of breath. (Tr. 222, 305). On examination, Jones had a normal gait, normal cardiovascular function, and was alert and oriented. (Tr. 222, 305).

On August 30, 2016, Jones told Karen Bond, PA-C, that had back pain and spasms after bending forward to clean a toilet the previous day. (Tr. 219, 302). She rated her pain as a 7 to 8 out of 10, but denied radiating pain, weakness, numbness, tingling, and leg pain. (Tr. 219, 302). On examination, Jones had mild back pain and tenderness on palpation; limited range of motion in her back; normal gait; normal strength and sensation in her extremities; and no joint swelling or tenderness. (Tr. 220, 303). Bond diagnosed Jones with "acute midline low back pain without sciatica," and prescribed Toradol, methocarbamol, and ibuprofen. (Tr. 220, 303).

On September 8, 2016, Daniel Adams, PA-C, noted that Jones had a history of low back pain, and that she reported that her pain was worse, caused difficulty walking, and was aggravated by sitting. (Tr. 218, 301). Jones said that Toradol didn't help her pain, but she had a "little" relief from Norco, Robaxin, ice/heat, ibuprofen, and acetaminophen. (Tr. 218, 301). Jones rated her pain as a 10 out of 10, and said that it radiated up her right leg, caused numbness and tingling in her right leg, and caused pinching in her left buttock. (Tr. 218, 301). On examination, Jones had a reduced ability to rise from squatting, normal heel-walk and toe-walk, guarded posture with gait, decreased range of motion, and 5/5 strength in her extremities. (Tr. 218, 301). Adams diagnosed Jones with acute low back pain with right-sided sciatica, and he prescribed ketorolac, cyclobenzaprine, prednisone, NSAIDs and acetaminophen for her pain. (Tr. 219, 301-02).

On September 26, 2016, Dr. Damm noted that Jones had frequent urination and joint pain in her toes. (Tr. 216-17, 299). Jones denied abdominal, chest, back, and flank pain; coughs and shortness of breath; and headaches and dizziness. (Tr. 217, 299-300). On examination, Jones

was oriented and well developed, and she had normal heart rate, chest sounds, and lung sounds. (Tr. 217). Dr. Damm continued Jones's medications. (Tr. 217, 300).

On January 11, 2017, Dr. Jewell saw Jones for a routine physical. (Tr. 296). Jones reported struggling with arthritis, including pain in her back, neck, left knee, and ankle. (Tr. 292, 331). Jones said that ibuprofen helped "some," and she wore a wrist guard to help with numbness/pain in her left hand. (Tr. 293, 331). Jones said that she wanted to join a gym, she had periods of abdominal pain in her right side, and she got up to urinate frequently at night. (Tr. 293, 331). On examination, Dr. Jewell indicated that Jones's neck was normal, and she had no tenderness in her spine, no abnormalities in her extremities, an antalgic gait, full strength/tone in her extremities, and intact sensation. (Tr. 295, 334). Tinel and Phelan tests were negative bilaterally. (Tr. 295, 334). Dr. Jewell diagnosed Jones with major depression in partial remission (mood good, stress level better), chronic pain, and nocturia. (Tr. 296, 335-36). He continued Jones's medications, recommended ibuprofen for her pain, recommended good hydration, and referred Jones to rheumatology. (Tr. 296, 336).

On February 2, 2017, Mark Brejt, MD, took x-rays of Jones's left knee and lumbar spine. (Tr. 360-61). Dr. Brejt determined that there were no acute factures or dislocations in the knee or spine, but there was some degenerative joint disease changes in the lumbar spine. (Tr. 360-61).

On March 27, 2017, Jones saw rheumatologist Alla Model, MD, for a consultation regarding her chronic pain. (Tr. 362). Dr. Model noted that Jones was on muscle relaxants and pain medications, and that she had a 2002 diagnosis of "normal cervical lordosis" due to muscle spasm or positioning and a minimal C45 neural foramen. (Tr. 362). Jones indicated that she was fatigued and had issues with swallowing, hearing, shortness of breath, dry mouth, chronic cough, joint pain, joint stiffness, back pain, headaches, and dizziness. (Tr. 367-68). However, she

denied abdominal pain, joint swelling, muscle weakness, numbness, tingling, and memory loss. (Tr. 367-68). On examination, Dr. Model noted that Jones appeared well; had no pain on palpation and good flexion/extension in her back; had no deformities, joint swelling, or tenderness; had a normal gait; and had normal and symmetric reflexes. (Tr. 369). Dr. Model diagnosed Jones with low back pain and recommended aqua therapy. (Tr. 369). She also found myalgia with no tender points and a mild "rheumatoid factor positive." (Tr. 370).

On April 27, 2017, Joshua Polster, MD, took x-rays of Jones's lumbar spine and left knee. (Tr. 388-89). Dr. Polster determined that Jones had severe degenerative disc disease at the L4-L5 spine, mild degenerative disc disease in the L5-S1 spine, degenerative facet changes in the lower lumbar spine, and no abnormalities in her knees. (Tr. 388-89).

On November 30, 2017, Jones told Jennalee Chagin, FNP-C, that she had throbbing/aching thumb pain and sharp thumb pain with movement. (Tr. 390). Examination showed a normal range of motion, strength, sensation, and capillary refill. (Tr. 391). Chagin diagnosed Jones with tendinitis and recommended a three-day mild prednisone burst, rest, ice, compression, and elevation. (Tr. 391-93).

On May 25, 2018, Jones saw Dr. Damm for treatment of chronic ear pain and chronic pain and limited range of motion in her right shoulder. (Tr. 397). Jones said that she could not lift due to her pain and requested a medication refill. (Tr. 397). Jones also endorsed back pain, joint pain, and myalgias. (Tr. 397). On examination, Dr. Damm found that Jones was oriented and well-developed; had normal cardiovascular and pulmonary functions; had decreased range of motion, tenderness, and pain in her right shoulder; and did not have any swelling or spasms. (Tr. 398). Dr. Damm diagnosed Jones with chronic joint pain, osteopenia, tinnitus, recurrent major depression, chronic anxiety, and acute pain in her shoulder. (Tr. 400). An x-ray of Jones's shoulder showed no evidence of fracture, dislocation, spurs, or narrowing of joint spaces.

(Tr. 412). Dr. Jones adjusted her medications for depression, tinnitus, and anxiety, and recommended physical therapy for her shoulder. (Tr. 400).

### B. Opinion Evidence

#### 1. Treating Physician – John Jewell, MD

On April 5, 2017, Dr. Jewell completed a medical source statement evaluating Jones's physical capacity. (Tr. 383-84). Dr. Jewell indicated that Jones could occasionally lift up to 10 pounds, but she could not frequently lift any weight. (Tr. 383). She could stand for up to 2 hours in a day and up to 30 minutes at a time. (Tr. 383). She could sit for up to 5 hours in a day and no more than 1 hour without interruption. (Tr. 383). Jones could rarely climb, balance, stoop, crouch, kneel, crawl, reach, push, pull, and manipulate things. (Tr. 383-84). And she had to avoid heights and moving machinery. (Tr. 384). Dr. Jewell explained that he imposed the limitations because any more strenuous activity would worsen Jones's joint stiffness and pain in her neck, low back, left knee, and ankles. (Tr. 383-84). He also stated that Jones's severe pain would interfere with her concentration, take her off task, and cause absenteeism. (Tr. 384). And Jones would require additional, unscheduled rest periods beyond the customary breaks for two to three hours. (Tr. 384).

#### 2. Physical Consultative Examiner – Dariush Saghafi, MD

On February 2, 2017, Jones saw Dariush Saghafi, MD, for a consultative medical examination. (Tr. 351-58). Dr. Saghafi noted that Jones was diagnosed with osteoarthritis in 2010 and was prescribed trazodone, Luvox, and Xanax. (Tr. 351). Jones told Dr. Saghafi that her osteoarthritic pain was worse when doing household chores, she had back spasms and lockups due to turning the wrong way on two occasions, and she had increased pain when shopping. (Tr. 351). She said that she could lift and carry up to 10 pounds, and Dr. Saghafi noted that "[s]he [was] standing or walking within 20-25 pain." (Tr. 351).

On examination, Jones rated her pain as a 0/10, and her muscle tone and bulk was normal. (Tr. 351-52). She had full strength and range of motion in her extremities, cervical spine, shoulders, hands, hips, knees, and ankles. (Tr. 352, 355-57). But she had some reduced range of motion in her dorsolumbar spine due to pain. (Tr. 357). Phalen, Tinel, Romberg, Babinski, and Hoover tests were all negative. (Tr. 353). She had a normal gait without predisposition to falls, and her arm swing was normal. (Tr. 353). Based on his evaluation, Dr. Saghafi opined that Jones could lift, push, and pull sufficiently to perform daily living activities; lift/carry up to 10 pounds; bend, walk, and stand for up to 25 minutes; understand the environment and peers well enough to communicate satisfactorily; and travel independently. (Tr. 353).

### 3. Mental Consultative Examiner – Deborah Koricke, Ph.D.

On February 1, 2017, Jones saw Deborah Koricke, Ph.D., for a consultative psychological evaluation. (Tr. 344-49). Jones told Dr. Koricke that she drove herself to the interview and reported that she had pain all over, depression, and anxiety. (Tr. 344). She said that she had worked as an administrator assistant before and in "several other jobs," but she had to quit working due to chronic pain and because she had problems getting along with others. (Tr. 345). Jones reported that she was diagnosed with depression in 1995, went to counseling from 1995 through 2010, and was prescribed Luvox, Xanax, and Trazodone for her symptoms. (Tr. 346). She said that she felt depressed, hopeless, and helpless at times, and that she had difficulties with anxiety, stress, and overall nervousness. (Tr. 346-47). Her worrying and depression caused difficulty sleeping, and she had low energy. (Tr. 347). Jones said that her daily activities included light house work, meal prep, walking, watching TV, spending time with her dogs, and attending church services. (Tr. 348).

On examination, Dr. Koricke noted that Jones walked without assistive devices, but with a slow gait. (Tr. 346). Jones made a good effort at responding to questions, but remained passive, withdrawn, and had difficulty recalling some of her personal history. (Tr. 346). Her speech was normal, thought logical and linear, and attention variable. (Tr. 347). During mental status tasks, Jones was persistent. (Tr. 347). She was oriented, had average intelligence, had no difficulty reading or writing, and had no difficulty with math. (Tr. 347). She had some difficulty with attending to her conversation, maintaining her focus, short term memory, attention, and concentration. (Tr. 347-48).

Based on her evaluation, Dr. Koricke diagnosed Jones with depressive disorder and anxiety disorder. (Tr. 348). Dr. Koricke determined that Jones had some difficulties in remembering and carrying out instructions, but her overall cognitive and intellectual functioning was average. (Tr. 348). Dr. Koricke noted that Jones had some difficulty with chronology, and that her depression and anxiety affected her concentration, attention, and memory. (Tr. 348). She indicated that Jones could have limitations or "some difficulty" responding appropriately to supervisors or coworkers due to her blunted affect, passivity, and sad mood. (Tr. 349). In sum, Dr. Koricke indicated that Jones was "viewed to have limitations in her ability to respond appropriately to work pressures in an environment due to symptoms associated with depression and anxiety." (Tr. 349).

### C.    Testimonial Evidence

Jones testified at the ALJ hearing. (Tr. 37-54). On a typical day, Jones said that she did light chores and laundry, walked her dog for 20 minutes, and made meals. (Tr. 43). She could stand for up to 40 minutes before she had to sit down or change positions to accommodate her back pain. (Tr. 43). If she sat longer than 40 minutes, her legs would become stiff and she would limp for a while. (Tr. 43). Jones had a driver's license, and she drove once or twice a

week. (Tr. 51-52). On a typical night, Jones watched TV until 11:00 pm, but her pain kept her awake until around 1:00 am. (Tr. 40). After she fell asleep, her pain would wake her up every two hours and she would have to go to the restroom four to six times. (Tr. 40-41). Jones last worked in 2016 in a customer service position, until she was laid off due to a company cutback. (Tr. 46-47). Her job involved talking to customers; using a computer to look up information, schedule appointments, and do other paperwork; and lifting no more than two pounds. (Tr. 46). She applied to other jobs but did not get them. (Tr. 47). And before her customer service job, Jones worked as a sales assistant at insurance companies and at a food and drug market, where she worked on computers, lifted boxes of papers and binders, and helped prepare reports/presentations. (Tr. 48-51).

Jones testified that she believed she could not work because her wrists, knees, neck, shoulders, and right arm were "in pain all the time." (Tr. 38). She said her pain was always rated between a five to seven out of ten, and that it was "sometimes up to ten." (Tr. 38). Jones also had back pain that she tried to avoid aggravating. (Tr. 38). And her pain disrupted her sleep, causing exhaustion and fatigue. (Tr. 40). Activities such as vacuuming, dusting, and mopping aggravated her arm pain, and she had back spasms when cleaning behind her toilet. (Tr. 38-39). Lifting anything more than two pounds and certain weather also aggravated her pain. (Tr. 39). Jones said that she did therapy for her right arm, after she pulled her rotator cuff while shaking a bottle of moisturizer. (Tr. 38-39). She also tried cold therapy, ice, heating pads, stretching, warm showers, rest, and elevation. (Tr. 39-40, 45). She also used ibuprofen, but she was limited on how much she could take due to a previous gastric sleeve surgery. (Tr. 39-40). She wore a wrist guard on her left arm and a leg pillow when she slept to prevent pain and numbness. (Tr. 41-42). Jones also said that she tried to watch her weight and walk, as recommended by her doctors. (Tr. 44). She also took vitamins for her osteopenia and

occasionally took Tramadol for her pain, but she was hesitant to use opiate pain relievers.  (Tr. 45, 53-54).  Jones started care with Dr. Jewell in 2000 or 2001, and she would see him once or twice a year if she had issues with her back.  (Tr. 52).

Jones also testified that she was depressed and had difficulty concentrating, often as a result of her pain and frustration about not being able to do more activities due to her pain.  (Tr. 41, 44).  And her pain disrupted her sleep, causing exhaustion, fatigue, and further difficulty concentrating.  (Tr. 40, 44).  Jones took Luvox for her depression, as well as Xanax as needed.  (Tr. 44, 53).  She also took trazodone at night, to help her depression and sleep issues.  (Tr. 53).

Robert A. Mosley, a vocational expert ("VE"), also testified.  (Tr. 54-60).  The VE testified that all of Jones's previous work would be classified as "administrative assistant," and that it was performed at the sedentary to light level.  (Tr. 55-56).  The ALJ asked if an individual with Jones's experience, age, and education, could work as an administrative assistant if she were limited to light exertion, except that she could "only occasionally be required to climb ramps and stairs, never use ladders, scaffolds, or ropes, occasionally balance, occasionally stoop, crouch, kneel and crawl."  (Tr. 56).  The VE said that such an individual could work an administrative assistant as generally performed and actually performed by Jones.  (Tr. 57).  And she could perform the same work if she were additionally limited to sedentary work.  (Tr. 57).  But if the above-described individual were limited to sedentary work and also "would be limited insofar as they would be able to maintain sufficient concentration, persistence and pace to perform simple, routine work; [and] would be limited to simple tasks that are not fast-paced, or have unusual production demands," she would not be able to work as an administrative assistant as Jones had performed the role.  (Tr. 57-58).  Such an individual could, however, work in a customer service position such as a referral agent, customer complaint clerk, or customer service clerk.  (Tr. 58-60).

11

### III.  The ALJ's Decision

The ALJ's September 28, 2018, decision found that Jones was not disabled and denied her application for SSI.  (Tr. 15-23).  In evaluating Jones's claim, the ALJ found that Jones had the severe impairments of "gastric sleeve surgery, obesity, and joint arthritis."  (Tr. 18).  The ALJ found that Jones's "medically determinable mental impairment of depression in remission" was not severe because it caused no more than mild limitations in her ability to: understand, remember, and apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage herself.  (Tr. 18).  The ALJ also found that she had the residual functional capacity to perform light work, except that "the claimant can occasionally use ramps and stairs but can never use ladders, ropes or scaffolds.  The claimant can occasionally balance, stoop, crouch and crawl."  (Tr. 19).

In evaluating Jones's RFC, the ALJ explicitly stated that he "considered all symptoms" in light of the medical and other evidence.  (Tr. 19).  The ALJ then reviewed Jones's testimony and the objective medical evidence as follows:

> The claimant testified that she is in pain all the time, in joints throughout her body.  Her pain is a 5-7 out of 10, and some days can be a 10 on the pain scale. She said that she cleans the house, and recently she aggravated her shoulder due to cleaning.  She stated that she can comfortable lift less than two pounds.  Her pain feels better with ice/cold therapy as well as heating pads, and she is taking ibuprofen.  She stated that she wakes every two hours at night. She stated that she feels frustrated and depressed.  She is able to do light chores as well as the laundry. she is able to go on short walks with her dog.  She can stand no longer than 40 minutes at a time.  She also stated that she can sit for 40 minutes, but can walk for only 20 minutes.  She cannot concentrate because she is too fatigued during the day.  She stated that she has applied for over 500 jobs, and she has had interviews, but was not offered a position.
>
> * * *
>
> A CT of the claimant's pelvis was completed in October of 2015, showing osteopenia and multilevel degenerative change seen within the visualized spine, as well as bilateral hip degenerative joint disease (lF/49).  In August of 2016, the claimant presented complaining of back pain, located in the lower back described as spasms. She denied weakness, numbness, tingling, and leg pain.  (lF/9).  On exam, it was

noted that the claimant had a normal gait, lower extremity muscular strength 5/5 bilaterally, no joint swelling, deformity, and tenderness. (lF/10).

The claimant presented to the Department of Urology in September of 2016. It was noted that she utilizes Xanax for anxiety as well as tramadol for her back pain. Urinalysis demonstrated a few red and white cells. Post-void residual on bladder scan was 100 mL. Her day frequency she felt was normal, but her night frequency is a major issue, voiding 4-6 times. She saw Dr. Kedia in 2009 who performed a type of sling for stress urinary incontinence. She denied incontinence currently. She evidently stopped her Ditropan, which was given to her previously. She was started on bethanechol 50 mg twice a day[.] A physical examination of her eyes, ears, nose, and throat, cardiovascular, respiratory, integumentary, neurological, extremities, and abdominal systems were unremarkable. (lF/6). On physical exam, it was noted that the claimant exhibited no edema, and she was oriented to person, time, and place. She was well-developed, well-nourished, and in no distress. (lF/7).

In January of 2017, the claimant presented with complaints of arthritic pain in different areas including her lower back, neck, and left knee. She noted taking Ibuprofen with some help. She stated that she wanted to join a gym. (2F/4). On exam she was noted to have an antalgic gait; however, she was noted to have 5/5 strength in all four extremities with normal tone, intact sensation to light touch, and a negative Tinel/Phelan tests bilaterally. She had no CV A/spine tenderness. (2F/6). She was diagnosed with recurrent major depression in partial remission, and she stated that her mood had been fairly good and her stress level better (2F/7).

The claimant attended a psychological consultative examination in February of 2017. It was noted that the claimant exhibited adequate speech patterns and showed insight into her life. She was oriented to person, place, and person. (4F/5). She denied suffering from hallucinations, delusions, and no delusional themes were noted in her evaluation. She denied suffering from other symptoms indicative of psychotic processes. (4F/5). She also attended a physical consultative examination in February. On exam, it was noted that her tone and bulk were normal for age and build in both upper and lower extremities. There were no signs of focal atrophy, fasciculations, or myotonia. There was no evidence of a resting or action tremor. There was no orbiting or pronator drift. (5F/3). The following negative tests were recorded: Phalen, Tinel, Romberg, Babinski, and Hoover. There was no evidence of dysdiadochokinesia or past pointing. (5F/4). Multiple views of the left knee were taken showing no evidence of fracture or dislocation (6F/2). Views of the spine showed degenerative joint changes present, but no acute fractures or dislocations (6F/3).

A physical exam was recorded in March of 2017, noting the claimant had a normal gait, normal reflexes which were symmetric, as well as a grossly intact sensation. She had no joint swelling, deformity, tenderness, and no tender points. (7F/8). In April, x-rays of the lumbar spine showed severe degenerative disc disease L4-5 and mild degenerative disc disease L5-51. Degenerative facet changes were noted in the lower lumbar spine. No fractures or abnormalities were seen. (7F/21).

Another recorded physical exam in November of 2017 showed the claimant positive for joint pain; however, she was negative for tingling, sensory damage, and focal

weakness (9F/6). The claimant then did not present to the doctor again until May of 2018, where she noted musculoskeletal pain in her right shoulder. (l0F/1). On exam, she exhibited no edema, no swelling, no effusion, and no spasms. However, her right shoulder exhibited decreased range of motion, tenderness, and pain. (l0F/2). An x-ray of the right shoulder was taken showing an unremarkable exam, with no narrowing, fracture, or dislocation. (1 0F/16). A "T-score" test was taken diagnosing the claimant with osteopenia. It was noted that a fracture risk greater than 20% should be considered for treatment. The claimant's risk was 8.2%. (l0F/21).

* * *

In this case, the claimant's BMI contained in office notes consistently measured the claimant's BMI at or above 30 which is considered obesity per SSR 02-lp (See lF/16, 22). It can reasonably be concluded that the claimant's obesity could be expected to exacerbate her pain, causing severe physical limitations.

(Tr. 20-22).

In evaluating the medical opinion evidence, the ALJ stated:

Little weight is given to consultative examiner Dr. Deborah Koricke. Her opinion is vague, and does not adequately describe her opinions on the claimant's functional limitations. She noted the claimant had "some difficulties" but did not elaborate on the specific limitations (See 4F). For these reasons, little weight is given.

Partial weight is given to consultative examiner Dr. Dariush Saghafi. He opined that the claimant is able to lift, push, and pull sufficiently to be able to perform AD L's and lift/carry up to 10 lbs. The claimant is able to bend, walk, and stand for up to 25 min. (See 5F). This is partially consistent with the record, which supports that the claimant would be capable of a less than light exertional level. Specifically, the record does not support the finding that the claimant would be limited to lifting 10 pounds. Physical exams noted that the claimant had 5/5 strength in all extremities, and a shoulder x-ray was negative. For these reasons, pa1tial weight is afforded.

Little weight is also given to the medical source statement of Dr. John Jewell (See 8F). Dr. Jewell opined that the claimant could occasionally lift up to 10 pounds, sit a total of 4-5 hours a day, stand 2, rarely perform postural activities, and need an additional 2-3 hours of breaks a day (See 8F). This source statement is not supported by the record, and Dr. Jewell lacks program knowledge. The record, for the above reasons, better supports a finding that the claimant would be capable of a less than light exertional level. Therefore, little weight is given.

(Tr. 22). Based on his review of the objective medical evidence, Jones's testimony, and the

opinion evidence, the ALJ concluded that "both the subjective and objective medical evidence of

record" supported his RFC finding. (Tr. 22). And, based on his assessment of Jones's RFC and the VE's testimony, the ALJ concluded that Jones could perform her past relevant work as an administrative assistant.[3] (Tr. 23). Thus, the ALJ determined that Jones was not disabled from May 31, 2016, through the date of his decision and denied her application for DIB. (Tr. 23).

## IV. Law & Analysis

### A. Standard of Review

In social security cases, the court's review is limited to determining: (1) whether substantial evidence supported the Commissioner's final decision; and (2) whether the decision was made pursuant to proper legal standards. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). If the court answers "yes" to both questions, it must affirm the Commissioner's decision – even if the court might have decided the claim differently on its own. *Cf. Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) ("[A] decision supported by substantial evidence must stand, . . . It is not our role to try the case *de novo*." (quotation omitted)).

"Substantial evidence" is *any evidence* that a reasonable person could believe is enough to back up the decision. *See Biestek*, 880 F.3d at 783 (citing *Richardson v. Perales*, 402 U.S.

---

[3] In the first paragraph of the ALJ's past relevant work analysis, the ALJ states that Jones "is unable to perform [her] past relevant work [as an administrative assistant] as actually or generally performed" because the "vocational expert testified that [Jones] would *not* be able to perform [her] past relevant work based on the [RFC]." (Tr. 23) (emphasis added). Then, in the second paragraph, the ALJ states:

> In comparing [Jones'] residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as actually and generally performed. The vocation expert testified . . . that [Jones] would be capable of performing past relevant work, based on the hypothetical given.

(Tr. 23). In other words, the ALJ makes explicit that either: (1) he is substituting his own opinion for the VE's opinion that Jones could *not* perform her past relevant work; or (2) his hypothetical question did not accurately reflect his RFC assessment. Moreover, the ALJ's opinion notably does not contain "[a] finding of fact as to the physical and mental demands of [Jones'] past job/occupation," as required by SSR 82-62, 1982 SSR LEXIS 27, at *10 (Jan. 1, 1982). *See* (Tr. 23). But, because Jones has not raised an issue challenging this analysis in her merits brief, any such challenge has been forfeited. *See Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517 (6th Cir. 2010).

15

389, 401 (1971)); *Rogers*, 486 F.3d at 241.  It does not require that *most* of the evidence in the record support the decision.  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) ("Substantial evidence is more than a scintilla of evidence but less than a preponderance.").  It also does not require the court to agree that the evidence relied upon was the most important or credible evidence in the record.  *Biestek*, 880 F.3d at 783 (noting that the court does not "resolve conflicts in evidence nor decide questions of credibility" (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997))).  If the Commissioner's factual conclusions were reasonably drawn from the record, they are within the Commissioner's "zone of choice" and cannot be second-guessed by the court.  *Mullen v. Bowen*, 800 F.32d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting Sarchet v. Charter, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn.

July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

**B.    Treating Physician Opinion**

Jones argues that the ALJ's decision must be reversed because the ALJ's reasons for giving treating physician Dr. Jewell's opinion less than controlling weight – that the opinion was inconsistent with other evidence in the record and that Dr. Jewel lacked program knowledge – were neither good reasons nor supported by substantial evidence. ECF Doc. 14 at 10-14. Specifically, Jones asserts that the ALJ did not sufficiently explain how he arrived at the conclusion that Dr. Jewell's opinion was inconsistent with other evidence in the record by pointing to particular discrepancies in treatment notes or other medical opinions. ECF Doc. 14 at 10-11. And, Jones contends, substantial evidence did not support the ALJ's reason because Dr. Jewell's opinion was *consistent* with other evidence in the record. ECF Doc. 14 at 11-14.

17

Jones also argues that a purported lack of program knowledge was neither a "good reason" for discounting the weight of Dr. Jewell's opinion, nor supported by substantial evidence. ECF Doc. 14 at 14.

The Commissioner responds that the ALJ "reasonably determined that Dr. Jewell's opinion was not consistent with the overall evidence," and adequately explained his conclusion by "referenc[ing] his previous discussion of the evidence." ECF Doc. 16 at 8. The Commissioner further asserts that the ALJ cited substantial evidence supporting his conclusion, including generally normal clinical findings (normal gait, full extremity strength, intact sensation, symmetric reflexes); unremarkable left knee ex-rays; and normal findings in Dr. Jewell's October 2015 and January 2017 treatment notes. ECF Doc. 16 at 8-9. Further, the Commissioner contends that Jones's challenge must fail because she has not pointed to any record evidence that the ALJ did not consider. ECF Doc. 16 at 9-10. Finally, in a footnote, the Commissioner asserts that the ALJ was "entitled to consider" Dr. Jewell's lack of program knowledge. ECF Doc. 16 at 9-10 n.6.

At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives. 20 C.F.R. § 404.1527(c). An ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good reasons for discrediting that opinion. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). Good reasons for giving a treating source's opinion less-than-controlling weight include: (1) a lack of support by medically acceptable clinical and laboratory diagnostic techniques; and (2) inconsistency with other substantial evidence in the case record (including contrary findings in the treating source's own records). *See Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 786 (6th Cir. 2017) ("An ALJ is *required* to give controlling weight to a treating physician's opinion, so long as that opinion is supported by clinical and laboratory diagnostic evidence [and] not inconsistent with other

substantial evidence in the record." (citing 20 C.F.R. § 404.1527(c)(2)); *Gayheart*, 710 F.3d 365, 376. But inconsistency with nontreating or nonexamining physicians' opinions alone is not a good reason for rejecting a treating physician's opinion. *See Gayheart*, 710 F.3d at 377 (stating that the treating physician rule would have no practical force if nontreating or nonexamining physicians' opinions were sufficient to reject a treating physician's opinion).

If an ALJ does not give a treating physician's opinion controlling weight, the ALJ must weigh the opinion based on: the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, whether the treating physician is a specialist, the physician's understanding of the disability program and its evidentiary requirements, the physician's familiarity with other information in the record, and other factors that might be brought to the ALJ's attention. *See Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2)-(6). Nothing in the regulations requires the ALJ to explain how he considered each of the factors. *See* 20 C.F.R. § 404.1527(c); *Biestek*, 880 F.3d at 786 ("The ALJ need not perform an exhaustive, step-by-step analysis of each factor."). However, to safeguard a claimant's procedural rights and permit meaningful review, the ALJ must at least explain the ultimate weight assigned to the opinion. *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011). When the ALJ fails to adequately explain the weight given to a treating physician's opinion, or otherwise fails to provide good reasons for giving less-than-controlling weight to a treating physician's opinion, remand is appropriate. *Cole*, 661 F.3d at 939; *see also Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) (holding that the failure to identify good reasons affecting the weight given to an opinion "'denotes a lack of substantial evidence, even whe[n] the conclusion of the ALJ may be justified based upon the record.'" (citing *Rogers*, 486 F.3d at 243)).

The court agrees that ALJ failed to apply proper legal standards in giving Dr. Jewell's opinion "little weight," because the ALJ failed to provide good reasons for giving the opinion less-than-controlling weight and failed to provide sufficient explanation to permit meaningful review by this court. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241; *Cole*, 661 F.3d at 938. On the surface, it may appear that the ALJ complied with the regulations' good-reasons requirement when he said that Dr. Jewell's opinion was "not supported by the record, and Dr. Jewell lacks program knowledge." But a lack of program knowledge is not a "good reason" for giving a treating physician's opinion less-than-controlling weight.[4] Here, a plain reading of 20 C.F.R. § 404.1527(c)(2) indicates that the *exclusive* reasons for giving a treating physician's opinion less-than-controlling weight are: (1) a lack of support by medically acceptable clinical and laboratory diagnostic techniques; and (2) inconsistency with other substantial evidence in the record. *See* 20 C.F.R. § 404.1527(c)(2) (providing no exception to the statement that, "[i]f we find that a treating source's medical opinion . . . is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."). The Commissioner's two-sentence footnote defending lack of program knowledge as a "good reason" – stating only that the ALJ was permitted to consider a lack of program knowledge under 20 C.F.R. § 404.1527(c)(6) – is an apples to oranges argument in this context. ECF Doc. 16 at 9 n.6. Although it is true that 20 C.F.R. § 404.1527(c)(6) permits an ALJ to consider a lack of program knowledge in determining the ultimate, less-than-controlling weight due to an opinion, the ALJ may not even reach that question until he has determined that the opinion is not due controlling

---

[4] An ALJ may consider a physician's lack of program knowledge in determining the ultimate weight it is due, when the opinion is not due controlling weight. *See* 20 C.F.R. § 404.1527(c)(6). But, before an ALJ may even reach that question, he must first determine whether the opinion is due controlling weight pursuant to 20 C.F.R. § 404.1527(c)(2).

weight pursuant to the reasons given under 20 C.F.R. § 404.1527(c)(2) (lack of support or inconsistency). Moreover, even if the court accepted a lack of program knowledge as a "good reason" for giving less-than-controlling weight to a treating physician's opinion, that conclusion is not supported by substantial evidence because the ALJ did not cite and a review of the record does not reveal _any_ evidence bearing upon Dr. Jewell's knowledge of or experience with the Social Security disability program.[5]

Tacitly recognizing that a lack of program knowledge is not a "good reason" for assigning less-than-controlling weight under 20 C.F.R. § 404.1527(c)(2), the Commissioner limits his above-the-line defense of the ALJ's decision to arguing that his statement that Dr. Jewell's opinion was inconsistent with other evidence in the record was a "good reason" for giving the opinion less-than-controlling weight. *See* ECF Doc. 16 at 7-11. It is true that inconsistency with the record can be a "good reason" for giving an opinion less-than-controlling weight under 20 C.F.R. § 404.1527(c)(2), and it is also a factor that may support an ALJ's ultimate decision to give the opinion "little weight," 20 C.F.R. § 404.1527(c)(4). And, despite the ALJ's failure to state whether he relied inconsistency and Dr. Jewell's lack of program knowledge collectively or alternatively, inconsistency with the record alone is a reason for giving a treating physician's opinion less-than-controlling weight. *See Thrushman v. Comm'r of Soc. Sec.*, No. 17-cv-10292, 2018 U.S. Dist. LEXIS 52411, at *9-10 (E.D. Mich. Mar. 29, 2018) ("[I]rrespective of the propriety of considering lack of program knowledge, inconsistency with other substantial evidence in the record is a sufficient, independent reason for discounting the doctor's opinion concerning specific limitations.").

---

[5] The record does not indicate that Dr. Jewell wrote in his treatment notes/opinion form or gave any hearing testimony stating, for example, "I don't know anything about the social security disability program." *See generally* (Tr. 28-61, 383-84).

But the ALJ never provided sufficient explanation regarding how or why he concluded that Dr. Jewell's opinion was inconsistent with other evidence in the record. *See* (Tr. 22). The ALJ merely stated: "This source statement is not supported by the record, and Dr. Jewell lacks program knowledge. The record, for the above reasons, better supports a finding that the claimant would be capable of a less than light exertional level." (Tr. 22). In order to decipher what the ALJ meant by "the above reasons," the court must "read the ALJ's decision as a whole and with common sense." *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–89 (7th Cir. 2010) (stating that an ALJ is not required to include his explanation in a single, tidy paragraph). Looking to the ALJ's other statements concerning Jones's physical capacity, the ALJ had said that the record supported "a finding that [Jones] would be capable of a less than light exertional level" because "[p]hysical exams noted [Jones] had a normal gait, normal reflexes which were symmetric, as well as a grossly intact sensation[, and s]he had no joint swelling, deformity, tenderness, and no tender points." (Tr. 22). The problem with grafting this explanation onto the ALJ's rationale for concluding that Dr. Jewell's opinion was not supported by record evidence still would not address the impact of Jones's chronic pain on her ability to sustain activities – that is, it would not confront the basis Dr. Jewell asserted as support for the limitations in his opinion. (Tr. 22, 383-84). Moreover, the ALJ did not reconcile that explanation with his only commentary concerning Jones's pain – that her "obesity could be expected to exacerbate her pain, causing severe physical limitations." (Tr. 22). Because the ALJ failed to provide adequate explanation to permit meaningful review of his finding that Dr. Jewell's opinion was due "little weight," the ALJ's written decision failed to draw an accurate and logical bridge between the evidence and the result. *Fleischer*, 774 F. Supp. 2d at 877. Thus, the ALJ failed to apply proper legal standards in evaluating Jones's claim and the decision must be vacated.

## C.    Consultative Examiners

Next, Jones argues that the ALJ failed to apply proper legal standards and reach a decision supported by substantial evidence in how he weighed Dr. Saghafi's and Dr. Koricke's consultative examiner opinions.  ECF Doc. 14 at 15-17.  First, Jones asserts that substantial evidence did not support the ALJ's conclusion – that Dr. Saghafi's opinion was inconsistent with findings that Jones had 5/5 strength and a shoulder x-ray was negative – because Dr. Saghafi restricted Jones to lifting no more than 10 pounds because of her "diffuse arthralgias" and not her lack of strength.  ECF Doc. 14 at 15-16.  Second, Jones contends that substantial evidence did not support the ALJ's conclusion – that Dr. Koricke's opinion was vague and not sufficiently explained – because Dr. Koricke had clearly and sufficiently explained that Jones's depression and anxiety caused limitations to her memory, concentration, and ability to interact appropriately with supervisors, coworkers, and work pressures.  ECF Doc. 16 at 16-17.  Thus, Jones asserts that the ALJ rejected Dr. Saghafi's and Dr. Koricke's opinions so that he could substitute his own opinion as a basis for rejecting Jones's claim.  ECF Doc. 14 at 17.

The Commissioner responds that the ALJ reasonably discounted Dr. Saghafi's opinion regarding her ability to lift no more than 10 pounds because his own findings showed normal gait, strength, and range of motion (except in the lumbar region).  ECF Doc. 16 at 11.  Further, the Commissioner asserts that Dr. Saghafi did not base his restriction on a finding that Jones had "diffuse arthralgias," but instead based it on Jones's own subjective statements that she had "diffuse arthralgias."  ECF Doc. 16 at 11-12.  With regard to Dr. Koricke's opinion, the Commissioner asserts that the ALJ had no duty to give any particular weight to Dr. Koricke's opinion, was permitted to consider that the opinion was vague, and reasonably determined that Dr. Koricke had failed to elaborate on the specific limitations in her opinion.  ECF Doc. 16 at 13-14.

Unlike treating physicians' opinions, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'" *Gayheart*, 710 F.3d at 376. Further, an ALJ does not need to articulate good reasons for rejecting a nontreating or nonexamining opinion. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (declining to address whether an ALJ erred in failing to give good reasons for not accepting non-treating physicians' opinions). Instead, an ALJ must weigh such opinions based on: (1) the examining relationship; (2) the degree to which supporting explanations consider pertinent evidence; (3) the opinion's consistency with the record as a whole; (4) the physician's specialization related to the medical issues discussed; and (5) any other factors that tend to support or contradict the medical opinion. *Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c).

The ALJ applied proper legal standards in weighing Dr. Saghafi's and Dr. Koricke's opinions. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. Here, the ALJ complied with the regulations when he explained that Dr. Saghafi's opinion was due only "partial weight" and Dr. Koricke's opinion was due only "little weight." 20 C.F.R. § 404.1527; (Tr. 22). Because they were not treating sources, the ALJ was not required to give controlling weight to or give "good reasons" for discounting Dr. Saghafi's and Dr. Koricke's opinions. 20 C.F.R. § 404.1527(c); *Gayheart*, 710 F.3d at 376; *Smith*, 482 F.3d at 876. Nevertheless, the ALJ adequately explained that Dr. Saghafi's opinion was only partially consistent with the record, which showed that Jones had full strength in all her extremities and a negative shoulder x-ray. (Tr. 22). The ALJ also adequately explained that Dr. Koricke's opinion was vague and failed to adequately describe Jones's functional limitations. *See Gaskin v. Comm'r of Soc. Sec.*, 280 F. App'x 472, 476 (6th Cir. 2008) (ALJ properly rebuffed portion of opinion because it was vague); *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 440 (6th Cir. 2010) (ALJ properly rejected

opinion when it was "too inconsistent and unclear to be helpful"); 20 C.F.R. § 404.1527(c)(6); (Tr. 22).

Substantial evidence also supported the ALJ's conclusions. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. Here, Dr. Saghafi's opinion limiting Jones to lifting 10 pounds was inconsistent with other evidence, including: (1) Dr. Saghafi's own finding that Jones had full strength and range of motion in her extremities; (2) Dr. Jewell's, PA-C Adams', and FNP-C Chagin's examination notes showing normal or full strength in September 2016, January 2017, and November 2017; and (3) Dr. Damm's February 2016 examination revealing no musculoskeletal issues. (Tr. 218, 227-28, 295, 301, 310, 321, 334, 352, 355-57). However, Dr. Saghafi's opinion – that Jones could lift, push, and pull; bend, walk, and stand for 25 minutes, and understand her environment/peers – was consistent with other evidence, including: (1) Jones's examination comments and hearing testimony that activities exacerbated her pain and limited her to about 20 minutes of walking or 40 minutes standing/sitting; and (2) treatment notes indicating that Jones had a normal gait and range of motion in all her extremities. (Tr. 43, 218, 220, 222, 231, 238, 295, 301, 303, 305, 334, 348, 369, 391). Likewise, substantial evidence supported the ALJ's conclusion that Dr. Koricke's opinion was vague, because which did not note a specific limitations or their extent, but said only that Jones's symptoms would cause "some difficulty" in various mental tasks. (Tr. 348-49). Thus, even if evidence could support a different result, the ALJ's decision to give Dr. Saghafi's opinion "partial weight" and Dr. Koricke's opinion "little weight" falls within the Commissioner's 'zone of choice' because it was reasonably drawn from the record. *Rogers*, 486 F.3d at 241; *Mullen*, 800 F.3d at 545. Nevertheless, because an ALJ considers non-treating physicians' opinions in light of all the other evidence in the record, the ALJ's conclusions regarding Dr. Saghafi's and Dr. Koricke's opinions could change upon a proper evaluation of Dr. Jewell's treating source opinion. Upon remand, the Commissioner

should determine whether changes in the weight given to Dr. Saghafi's and Dr. Koricke's opinions are warranted.

## VI.     Recommendation

Because the ALJ failed to apply proper legal standards in evaluating treating physician Dr. Jewell's April 2017 opinion, the Commissioner's final decision denying Jones's application for DIB must be VACATED and the case REMANDED for further proceedings consistent with this memorandum of opinion and order.

**IT IS SO ORDERED.**

Dated: February 21, 2020

                                        Thomas M. Parker
                                        United States Magistrate Judge